# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JAMES R. OVERSTREET, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 10-cv-656-TLW |
| MICHAEL J. ASTRUE, Commissioner of the Social Security Administration, | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff James R. Overstreet, pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c), requests judicial review of the decision of the Commissioner of the Social Security Administration denying him disability benefits under Title II of the Social Security Act ("Act"). In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before the undersigned United States Magistrate Judge, and any appeal of this decision will be directly to the Tenth Circuit Court of Appeals. (Dkt. # 8).

## Introduction

When applying for disability benefits, a plaintiff bears the initial burden of proving that he or she is disabled. 42 U.S.C. § 423(d)(5); 20 C.F.R. § 404.1512(a). "Disabled" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). The evidence establishing a disability must come from "acceptable medical sources" such as licensed and

certified psychologists and licensed physicians. 20 C.F.R. § 404.1513(a). A plaintiff is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

In reviewing a decision of the Commissioner, the court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

**BACKGROUND**

Plaintiff, James R. Overstreet, a forty-five year old male, applied for disability benefits on April 6, 2007, alleging an onset date of August 29, 2006. (R. 90). Plaintiff claimed that his mental health issues rendered him disabled. Id. After a review of plaintiff's medical records and a mental status exam conducted by an examining psychologist, the Commissioner denied plaintiff's application on August 14, 2007. (R. 45, 47). The denial was affirmed on reconsideration on November 9, 2007. (R. 46, 55). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (R. 58). That hearing was held on January 29, 2009. (R. 20, 69).

At the hearing before the ALJ, plaintiff amended his onset date to October 18, 2007. (R. 23). Plaintiff noted that the amended onset date reflected the date of plaintiff's sobriety. Id. As counsel for plaintiff acknowledged, the record evidence of Plaintiff's hospitalizations and treatment reflected a history of illegal substance abuse, but by amending the onset date, the ALJ could focus on plaintiff's ongoing mental health struggles. Id. After hearing testimony from plaintiff and a vocational expert, the ALJ issued a written decision denying plaintiff disability benefits. (R. 10). Plaintiff appealed that decision.

**Plaintiff's Work History**

Between 1991 and 2004, plaintiff worked as a debt collector in an office setting. (R. 114-15). He left that job in August 2004. (R. 114). In January 2005, plaintiff began work as a general laborer doing assembly and janitorial work. (R. 114, 116). He was fired from that job in August 2006 while receiving inpatient treatment for his abuse of crack cocaine. (R. 227). Since August 2006, plaintiff has not held a job, although in September 2008, plaintiff did tell his treatment provider that he had been working for cash. (R. 603).

**Plaintiff's Medical History**

Shortly before plaintiff's first alleged onset date of August 29, 2006, plaintiff sought treatment at Parkside Hospital for crack cocaine addiction and management of his depressive symptoms. (R. 157). Plaintiff remained in the hospital from August 11 through August 15, 2006. Id. Plaintiff tested positive for cocaine and spent three days undergoing "detox" from the crack cocaine and receiving mood stabilizers to address his mental health issues. (R. 158, 188). On admission and discharge, plaintiff was diagnosed with cocaine dependence and bipolar disorder. (R. 159, 161). Plaintiff left Parkside Hospital with a treatment plan in place. (R. 157, 159).

Five days after being discharged from Parkside Hospital, plaintiff presented at Henryetta Medical Center for treatment. (R. 207). Plaintiff again tested positive for cocaine. (R. 216). After three days of "detox," plaintiff was discharged. (R. 212). Plaintiff indicated that he intended to seek inpatient treatment for his crack cocaine addiction. Id.

Plaintiff did enter an inpatient rehabilitation program at Valley Hope two days later, on August 25, 2006. (R. 226). At that time, plaintiff admitted to a relapse and tested positive for cocaine. (R. 247, 254). Valley Hope acknowledged that plaintiff had previously been diagnosed with bi-polar disorder but did not independently confirm the diagnosis. (R. 227). Plaintiff completed inpatient treatment on September 22, 2006, and was discharged with a guarded prognosis. Id. Valley Hope maintained his bi-polar medication regimen and discharged him with a follow-up appointment for medication management, but his primary diagnosis remained "cocaine dependence." Id.

The record does not indicate whether plaintiff began his outpatient therapy after leaving the inpatient program. Plaintiff was admitted to Wagoner Mental Health on November 21, 2006,

with extreme anxiety and racing thoughts. (R. 267). Plaintiff was using crack cocaine again and tested positive upon admission to the hospital. Id. Wagoner Mental Health diagnosed plaintiff with "Cocaine-induced mood disorder. Cocaine abuse. Rule out bipolar affective disorder." Id. After three days of stabilizing treatment, plaintiff was discharged on November 24, 2006. Id. Plaintiff "decline[d] any further need for inpatient treatment at a chemical dependency unit." Id.

Plaintiff attended one outpatient therapy session at Cree Oaks on December 7, 2006. (R. 290). Plaintiff presented with symptoms of mood swings and depression and admitted to using crack cocaine within the last week. Id. Plaintiff stated that he had not been able to work "because of drug problems." (R. 291).

Plaintiff was subsequently admitted to the emergency room at St. John's on December 27, 2006. (R. 304). Plaintiff sought treatment for his emotional problems, admitted that he was using crack cocaine, and asked for "detox." Id. Plaintiff again tested positive for cocaine. (R. 300). St. John's released plaintiff the next day with instructions to return to Cree Oaks for "dual diagnosis" intensive outpatient therapy. (R. 306).

Plaintiff was admitted to Brookhaven Hospital on March 24, 2007, where he once again tested positive for cocaine. (R. 318). Brookhaven diagnosed him with "1. Cocaine dependence. 2. Bipolar disorder, not otherwise specified" on admission and at discharge. Id. Plaintiff stated that he had been sober for two months before relapsing, due in part to a forty-eight day stint in jail for shoplifting beer to buy crack cocaine. (R. 318, 321, 324). Plaintiff also stated that he "has been dealing with significant depressive symptoms that he states began a few days ago as a result of his relapse." (R. 318). Although plaintiff had experienced "depressive episodes in absence of drug use," he stated that "his mood was stable" during his recent period of sobriety. (R. 318-19). Plaintiff was discharged five days later. (R. 321).

Plaintiff attended one therapy meeting at Cree Oaks in April 2007. (R. 297). He reported high levels of irritability. Id. Plaintiff admitted to "staying busy" by riding along with his brother, a process server, and cleaning. Id. Plaintiff stated that he was not working because "he thinks this would ruin his chances" at receiving disability benefits. Id. Later that month, plaintiff sought treatment at St. Francis twice for chest pain. (R. 464-504). On the first visit, plaintiff denied any drug use. (R. 488). On the second visit, doctor's spoke with plaintiff's brother, who advised that plaintiff was addicted to crack cocaine. (R. 479). Plaintiff again denied any drug use. Id.

In early May 2007, plaintiff sought treatment at St. John's. (R. 376). Plaintiff admitted to using $300-400 in crack cocaine daily. Id. Plaintiff received "detox" treatment but refused to attend group therapy sessions. (R. 376-77). Two weeks later, plaintiff sought "detox" treatment again at Laureate Clinic. (R. 409). Plaintiff was positive for cocaine and opiates on admission and stated that he was using crack cocaine regularly. (R. 409-10, 420). Plaintiff again refused to attend any group therapy sessions and stated that he could receive adequate assistance through outpatient therapy. (R. 412, 414). Plaintiff's doctors diagnosed plaintiff with cocaine withdrawal and dependence and noted that his drug use "clouds ability to clarify other axis one disorders." (R. 418). Doctors also noted that plaintiff had not been taking his medications. (R. 413).

Two days after discharge from the Laureate Clinic, plaintiff returned to the St. Francis emergency room with complaints of chest pains as a result of cocaine use. (R. 439, 441). Plaintiff admitted that he had begun using cocaine immediately after his discharge from the Laureate Clinic and that he had made false admissions of alcohol abuse in order to stay at the clinic. (R. 441). Plaintiff left St. Francis on May 29, 2007, and was admitted to Griffin

Memorial the next day. (R. 505). Plaintiff tested positive for cocaine on admission. Id. Shortly after his admission, plaintiff began complaining of tooth pain. The staff at Griffin Memorial suspected that plaintiff was seeking medication to blunt the symptoms of his cocaine withdrawal. (R. 506). Plaintiff subsequently asked to be discharged because he felt he did not need inpatient treatment. Id. His diagnosis at discharge was "Substance Induced Mood Disorder" and "Cocaine Dependence." (R. 507). From June to September 2007, plaintiff attended monthly outpatient therapy sessions. (R. 553-562). These meetings apparently benefitted plaintiff, as plaintiff claimed a sobriety date of October 18, 2007. (R. 20).

Meanwhile, as part of the disability benefits process, plaintiff received a status exam in July 2007. Plaintiff told Dr. Michael D. Morgan that he had been receiving treatment for bipolar disorder, depression, and ADHD for four years. (R. 530). Although plaintiff stated that the treatment was effective, he also stated that he could not work due to his conditions. Id. Plaintiff described being able to do basic daily activities, including grooming himself and completing household chores. (R. 531). Although he slept approximately fifteen hours a day, plaintiff also described having regular contact with family and friends and accompanying his brother to work. Id. Plaintiff denied any episodes of decompensation. Id. Plaintiff also stated that he had not used cocaine in nine months. (R. 532). Dr. Morgan diagnosed plaintiff with cocaine dependence (primary) and depressive disorder, NOS. (R. 533). Dr. Morgan found that plaintiff had normal memory and concentration. (R. 532). Dr. Morgan had reservations about plaintiff's history of bipolar disorder, depression, and ADHD, given plaintiff's significant history of substance abuse. (R. 530). Dr. Morgan concluded that plaintiff would improve in less than one year with proper treatment. (R. 533).

The Psychiatric Review Technique ("PRT") form completed on August 14, 2007, reflected Dr. Morgan's findings and concluded that plaintiff had mild restrictions in his daily activities and in maintaining concentration, persistence, or pace and moderate restrictions in maintaining social functioning. (R. 549). The doctor completing the PRT form also found that plaintiff had suffered one or two episodes of decompensation of extended duration. Id.

After the initial denial of benefits and reconsideration in 2007, plaintiff continued outpatient treatment at Cree Oaks. Records reflect that he began semi-regular group sessions and medication management in April 2008 and continued through February 2009. (R. 581-92, 593-613). During that time, plaintiff initially struggled to find balance with his moods and medication. (R. 593-613). In June and July, plaintiff noticed "some improvement in mood" and a decrease in his depression, even though he still required adjustments to his medication. (R. 598, 607). By September, plaintiff's mood had improved considerably, and he cited family and work problems as the basis for his depression. (R. 603). Plaintiff also stated in September that he had been working for cash. Id.

By November 2008, plaintiff reported that he was only feeling depressed "a few times a month" and that his mood swings were "not bad." (R. 586, 592). Plaintiff's wife also noticed the improvements in his mood. (R. 586). Plaintiff reported that he had "the perfect balance of medication" and was able to take care of the house while his wife worked, maintain an active role in his church, spend time with a friend who owned a hobby shop, and maintain "multiple close friendships." (R. 592).

**ALJ Hearing**

On January 29, 2009, the ALJ held the hearing on plaintiff's application for disability benefits. During that hearing, plaintiff testified that he experienced severe mood swings and

8

high levels of irritability. (R. 25-30). Small things would cause him to cry or to "get[] in arguments with people." (R. 26). He reported "griping" and "screaming" at his daughter for "no reason." (R. 26-27). During his manic periods, plaintiff had "racing thoughts," felt high energy but had low productivity, and spent money to make himself feel better. (R. 28-29). When depressed, plaintiff could not sleep but spent up to twelve hours per day in bed. (R. 30-31). Plaintiff also isolated himself when depressed. (R. 30).

Following plaintiff's testimony, the vocational expert gave testimony describing plaintiff's past work. (R. 37-38). The vocational expert described plaintiff's job as a debt collector as sedentary work with an SVP of five. Id. Plaintiff's custodial work, which included heavy lifting, was both medium and heavy work with an SVP of three. (R. 38). The ALJ then posed a hypothetical to the vocational expert. (R. 38-39). The ALJ asked the vocational expert to consider a man of plaintiff's age with a high school education who could perform medium, light, and sedentary work without physical limitations. (R. 38). The ALJ then asked the vocational expert to add non-exertional limitations of substance addiction disorder and affective disorder, which would permit plaintiff to perform simple tasks and some complex tasks and to relate superficially to others with minimal contact with the public. (R. 38-39). The ALJ then had the plaintiff describe his medications to the vocational expert. (R. 39). Based on that hypothetical, the vocational expert testified that plaintiff could return to custodial work but would not be able to return to his job as a debt collector. Id. The vocational expert also testified to a number of other jobs that plaintiff could perform. (R. 40-41).

The ALJ then posed a second hypothetical using a man of the same age and educational background. (R. 41). The ALJ asked the vocational expert to consider the limitations that plaintiff had described in his testimony. Id. The vocational expert testified that based on

plaintiff's testimony regarding his mood swings and his racing thoughts, plaintiff would be unable to do any competitive work. (R. 41-42).

**The ALJ's Decision**

The ALJ found that plaintiff had three severe impairments: bipolar mood disorder, depressive disorder NOS, and cocaine dependence (in remission). (R. 12). The ALJ concluded, however, that plaintiff's impairments, singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. The ALJ applied the special technique required for consideration of mental health issues and adopted the findings of Dr. Morgan's examination and the PRT form, which found that plaintiff had mild restrictions in activities of daily living and concentration, persistence, or pace, moderate restrictions in social functioning, and only one or two episodes of decomposition of an extended duration. (R. 13).

The ALJ then considered plaintiff's residual functional capacity and found that plaintiff's mental conditions began to improve in the spring of 2007 while he was at Brookhaven Hospital and Laureate Clinic. (R. 15). The ALJ found that plaintiff would make additional progress if he was compliant with his medications and that plaintiff had the ability to do so. Id. The ALJ also adopted Dr. Morgan's findings, in which plaintiff stated that he could engage in strenuous activity and perform household chores. Id. Based upon this evidence, the ALJ concluded that plaintiff's residual functional capacity was consistent with the Mental Residual Functional Capacity Assessment conducted on August 14, 2007. The ALJ found that plaintiff could perform his past relevant work as a custodian, a finding consistent with the testimony of the vocational expert, and could also perform a range of other jobs consistent with his residual

functional capacity. (R. 15-16). Accordingly, the ALJ concluded that plaintiff was not disabled. (R. 17).

## ANALYSIS

Plaintiff appealed the ALJ's decision and raised three points of error: (1) that the ALJ erred in his Step Five analysis because the hypothetical he posed to the expert was not specific, in that it failed to include findings regarding plaintiff's functional limitations; (2) that the ALJ failed to apply the "special technique" regarding plaintiff's mental impairments and that plaintiff meets the requirements for disability when the "special technique" is applied; and (3) that the ALJ failed to make specific credibility findings and erred in failing to consider all of the record evidence that supported plaintiff's credibility.

### The ALJ's Hypothetical

Plaintiff argues that the ALJ "failed to even propound an actual hypothetical to the vocational expert." (Dkt. # 12 at 2). Specifically, plaintiff argues that the ALJ only "gave broad exertional demands, [sic] he did not define them at all." Id. Plaintiff further argues that the ALJ failed to make proper findings of plaintiff's residual functional capacity in posing the hypothetical. Id. The Commissioner argues that the hypothetical was proper because the ALJ ensured that the vocational expert understood the parameters of the exertional demands in his hypothetical and listed plaintiff's non-exertional limitations. (Dkt. # 13 at 2). The Commissioner also argues that the Tenth Circuit Court of Appeals recently rejected this argument in Qualls v. Astrue, 428 Fed.Appx. 841 (10th Cir. 2011), a case in which plaintiff's counsel represented the claimant. Id.

An ALJ's hypothetical question to a vocational expert at step five of the analysis must accurately and precisely reflect all of the "impairments and limitations that are borne out by the

11

evidentiary record." Decker v. Chater, 86 F.3d 953 (10th Cir. 1996). See also Hargis v. Sullivan, 945 F.2d 1482, 1492 (10th Cir. 1991) (citation omitted). In reviewing the ALJ's hypothetical in this case for precision and accuracy, the Court finds Qualls on point and persuasive.[1] In Qualls, the Tenth Circuit Court of Appeals rejected the argument that an ALJ's hypothetical, which set the parameters for exertional demands by listing the different categories, was improper where the vocational expert testified that she was familiar with the requirements of each category. Qualls, 428 Fed.Appx. at 850-51.

Here, the record clearly reflects that the ALJ and the vocational expert were discussing the limits of medium, light, and sedentary work as those categories are defined in 20 C.F.R. § 404.1567.[2] The vocational expert testified that he was familiar with those definitions, and as an expert, the ALJ did not err in relying on the vocational expert's testimony that he knew and understood those definitions.

Plaintiff also argues that the ALJ did not include any findings of plaintiff's functional limitations in posing the hypothetical to the vocational expert. A simple review of the hearing transcript reveals that plaintiff's claim is without merit. The ALJ limited the level of functioning to "simple and some complex tasks," superficial relationships with others, "minimal contact with the general public," and minimal issues with concentration, persistence, and pace. (R. 38-39). These functional limitations accurately reflect Dr. Morgan's findings and the findings on the

---

[1] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for their persuasive value."

[2] Plaintiff argues that the ALJ failed to consider his exertional limitations. The record, however, contains no evidence that plaintiff ever had any exertional limitations. Plaintiff told Dr. Morgan that he was capable of strenuous exertion, and the ALJ only considered work in the medium, light, and sedentary ranges, even though plaintiff had past experience doing heavy work. Because the ALJ was only required to set limits in his hypothetical based upon the record evidence, the Court finds no error on this issue.

PRT form, findings that the ALJ relied upon in reaching his decision. (R. 13). The ALJ's hypothetical, therefore, was proper, and the ALJ was justified in relying on the vocational expert's testimony. See Gay v. Sullivan, 986 F.2d 1336, 1341 (10th Cir. 1993) (holding that where an ALJ's findings regarding impairments and functional limitations are adequately reflected in the hypothetical, the vocational expert's testimony provides a proper basis for the ALJ's decision).

**Evaluation of Impairments**

Plaintiff argues that the ALJ erred in performing his evaluation at steps two and three when he failed to explain the source of his findings in his application of the "special technique." (Dkt. # 12 at 3-4). Plaintiff also argues that the ALJ erred in finding that plaintiff's impairments did not meet or equal a listed impairment "because he has had well over the required number of repeated episodes of decompensation and deterioration for disability." Id. The Commissioner argues that plaintiff's argument fails as a matter of law. The Commissioner contends that although plaintiff must establish that he meets two of the four broad domains of function, plaintiff only argued that he meets one domain; therefore his argument fails as a matter of law. (Dkt. # 13 at 3).

When a claimant suffers from a medically determinable mental impairment, the ALJ must apply a "special technique" to evaluate the severity of the mental impairment. See 20 C.F.R. § 404.1520a. The "special technique" measures a claimant's mental functional capacity in four areas: "activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3). The ALJ must also make "specific finding[s] as to the degree of limitation in each of the functional areas." 20 C.F.R § 404.1520a(e)(2). The first three areas are measured on a scale of "[n]one, mild, moderate,

marked, and extreme." 20 C.F.R. § 404.1520(c)(4). The fourth area is measured on a scale of "[n]one, one or two, three, four or more." Id.

Once the ALJ has made findings under the special technique, the ALJ must determine whether the claimant's mental impairment is severe. See Stokes v. Astrue, 274 Fed.Appx. 675, 679 (10th Cir. 2008); 20 C.F.R. § 404.1520a(d)(1). If the mental impairment is severe, the ALJ must then compare the functional limitation ratings and any pertinent medical findings to the listed mental disorders and determine whether the severe mental impairments meet or are medically equivalent to a listed mental disorder. See Stokes, 274 Fed.Appx. at 679; 20 C.F.R. § 404.1520a(d)(2).

In challenging the specificity of the findings, plaintiff argues that the ALJ failed to identify the source of the evidence used to reach his conclusions and to define the weight given to those sources and that this failure constitutes reversible error. Plaintiff correctly states that the ALJ did not cite the evidence he relied upon in applying the special technique; however, based upon the evidence in the record, it is clear that the ALJ adopted Dr. Morgan's report and the PRT form in reaching his findings. (R. 13, 530, 539). As another district court has held, "[w]hile the ALJ perhaps could have been more explicit in tying his step two and step three findings to the specific evidence regarding plaintiff's impairments," the ALJ's findings are specific enough to satisfy the "special technique" and are supported by substantial evidence in the record. Klobas v. Astrue, 2010 WL 383141, *3 (D.Colo. January 29, 2010). Accordingly, any error is harmless.

Plaintiff next argues that he is entitled to a finding of disability based upon his history of repeated episodes of decompensation. In this case, the ALJ found that plaintiff had "Bipolar Mood Disorder, Depressive Disorder NOS, and Cocaine Dependence (in Remission)." (R. 12). Both bipolar mood disorder and depressive disorder NOS are "Affective Disorders." 20 C.F.R.

Part 404, Subpart P, App. 1, § 12.04. To meet the level of severity necessary to support a finding of disability, plaintiff must meet one of two tests. First, plaintiff must establish that he suffers from an affective disorder and display two of the following: "1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence or pace; or 4. Repeated episodes of decompensation, each of extended duration." Id. Alternatively, plaintiff can establish that his mental impairments are disabling by proving a

> [m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medicine or psychosocial support, and one of the following: 1. Repeated episodes of decompensation, each of extended duration; . . . .

Id.

Plaintiff contends that each of his multiple hospitalizations constitutes an episode of decompensation of extended duration.³ Plaintiff also cites his continued treatment at Cree Oaks as evidence that he meets or equals the listing for affective disorders. The Commissioner argues that plaintiff's hospitalizations all occurred prior to his amended onset date and should not be considered. Alternatively, the Commissioner argues that plaintiff's course of treatment indicates that he was not heavily impacted by his impairments.

Based upon the ALJ's findings with respect to plaintiff's functional limitations, it is clear that plaintiff cannot satisfy the requirements of the first test, which the ALJ referenced as the

---

³ Although the Court accepts plaintiff's argument as true for purposes of analyzing step three, the Court is not making a finding that plaintiff's multiple hospitalizations satisfy the criteria for multiple episodes of decompensation for an extended duration. In fact, the evidence indicates that plaintiff's hospitalizations were related to his crack cocaine addiction rather than to his affective disorders and, therefore, would not qualify. Because the Court is able to resolve plaintiff's assertion of error without making a finding, however, the Court will not make findings on that issue.

15

"'paragraph B' criteria." (R. 13). Plaintiff had only mild and moderate limitations in the first three areas of functioning. Id. Therefore, even if the ALJ found that plaintiff's multiple hospitalizations constituted repeated episodes of decompensation, plaintiff would not be entitled to a finding of disability because the first test requires findings in two of the four areas of functioning. 20 C.F.R. Part 404 Subpart P, Appendix 1, §12.04.

Under the second test, which the ALJ cited as the "'paragraph C' criteria," repeated episodes of decompensation, coupled with a documented history of the disorder, can establish disability. See id. Substantial evidence supports plaintiff's diagnosis of one or more affective disorders, thereby satisfying the documented history requirement. Plaintiff's multiple hospitalizations, however, all occurred prior to his amended onset date of October 18, 2007; therefore, they are outside the relevant time period. See SSR 83-20 (holding that "[t]he onset date of disability is the first day an individual is disabled as defined in the Act and the regulations."). Evidence outside the relevant time period may be considered to the extent that it assists the ALJ in determining disability during the relevant time period. See Hamlin v. Barnhart, 365 F.3d 1208, 1215 (10th Cir. 2004). Such evidence, however, is not dispositive because a finding of disability based solely upon evidence outside the relevant time period "would be contrary to the Social Security Act . . . which requires proof of disability during the time for which it is claimed." Pyland v. Apfel, 149 F.3d 873, 878 (8th Cir. 1998).

Plaintiff's medical evidence during the relevant time period fails to show any periods of decompensation. See 20 C.F.R. Part 404, Subpart P, Appendix 112.00(C)(4) (defining "episodes of decompensation" and stating that such episodes "may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g. hospitalizations)"). Plaintiff also does not argue that any

16

episodes of decompensation occurred during the relevant time period. All of the hospitalizations that plaintiff characterized as episodes of decompensation occurred prior to his amended onset date. Accordingly, the ALJ did not err in finding that plaintiff was not disabled because his affective disorders did not meet or medically equal a listing.

**<u>Credibility Determination</u>**

Finally, plaintiff argues that the ALJ's credibility findings constituted conclusory "boilerplate language" and that the evidence, some of which the ALJ failed to consider, supported a finding that plaintiff was credible and, therefore, disabled. (Dkt. # 12 at 6-8). The Commissioner argues that the ALJ made sufficient findings to support the finding that plaintiff was not totally credible. The Commissioner notes that plaintiff's "boilerplate language" argument also was rejected in <u>Qualls</u> and contends that the ALJ based his credibility finding on a number of factors. (Dkt. # 13 at 5-7).

This Court will not disturb an ALJ's credibility findings if they are supported by substantial evidence because "[c]redibility determinations are peculiarly the province of the finder of fact." <u>Cowan v. Astrue</u>, 552 F.3d 1182, 1190 (10th Cir. 2008) (citing <u>Diaz v. Secretary of Health & Human Svcs.</u>, 898 F.2d 774, 777 (10th Cir. 1990). Credibility findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." <u>Id.</u> (citing <u>Huston v. Bowen</u>, 838 F.2d 1125, 1133 (10th Cir. 1988)(footnote omitted)). The ALJ may consider a number of factors in assessing a claimant's credibility, including "the levels of medication and their effectiveness, the extensiveness of the attempts . . . to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, . . . and the

consistency or compatibility of nonmedical testimony with objective medical evidence." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).

Plaintiff's "boilerplate language" argument fails in this case because boilerplate language is insufficient to support a credibility determination only "in the absence of a more thorough analysis." Hardman v. Barnhart, 362 F.3d 676, 679 (10th Cir. 2004). Although the ALJ did recite the generally disfavored boilerplate language, the ALJ also cited a number of findings which indicated that plaintiff's symptoms were improving to the point that plaintiff could return to work. (R. 15). Specifically, the ALJ cited plaintiff's own statements, the observations of other doctors, and plaintiff's activities of daily living as evidence to support his finding that plaintiff was not entirely credible. Id. The Court does find that the ALJ's analysis is not as comprehensive as it could be, given the additional evidence in the record that would have supported the ALJ's credibility determination. See Harjo v. Astrue, 336 Fed.Appx. 810 (10th Cir. 2009) (admonishing ALJs to provide detailed analyses of credibility determination "in order to make [appellate review] meaningful."). However, the Court will not overturn the ALJ's credibility findings as long as the findings made are supported by substantial evidence. See Kepler, 68 F.3d at 391. For this reason, plaintiff's argument that the record contains evidence that the ALJ should have found plaintiff credible also fails.

## **CONCLUSION**

For the above stated reasons, this Court AFFIRMS the Commissioner's decision denying Disability Insurance Benefits.

SO ORDERED this 23rd day of March, 2012.

T. Lane Wilson
United States Magistrate Judge